IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JORDAN MOZER & ASSOCIATES, LTD., an Illinois corporation, ) ) ) Plaintiff, ) ) vs. ) ) GENERAL CASUALTY COMPANY OF WISCONSIN, a Wisconsin corporation, ) ) ) Defendant. ) | Case No. 14-cv-10264 Hon. Ronald A. Guzmán |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON COUNT V PURSUANT TO SECTION 155 OF THE ILLINOIS INSURANCE CODE**

**INTRODUCTION**

Plaintiff Jordan Mozer & Associates, Ltd. ("JMA") has filed a post-trial motion asking the Court to award JMA sanctions pursuant to Section 155 of the Illinois Insurance Code ("Section 155") against Defendant General Casualty Company of Wisconsin ("GC"). Section 155 permits an award of attorney fees, costs, and a penalty not to exceed $60,000. However, Section 155 only applies if the insured establishes that the insurer acted "vexatiously and unreasonably" in adjusting the claim. JMA has failed to meet its burden of proof on this issue. Importantly, Illinois law recognizes that, where, as here, there is a bona fide coverage dispute, the insurer has a complete defense to a Section 155 claim. Even setting that issue aside, however, the alleged facts on which JMA relies to support its Section 155 claim (which GC believes are not an accurate reflection of the trial record)—even if credited—do not support the imposition of Section 155 sanctions when viewed in the light of relevant case law. The Court should deny JMA's request for Section 155 relief.

JMA also seeks prejudgment interest on the approximately $1.4 million verdict, but that request fares no better. JMA seeks interest under the Illinois Interest Act (the "Interest Act"). JMA, however, ignores that an award of prejudgment interest is discretionary under the Interest Act and only applies where the sum owed under the contract is liquidated or subject to easy determination. Prejudgment interest has been denied in numerous insurance cases where, as here, the amount of the insured's claim varied dramatically over time and the insured was awarded only a fraction of its claimed damages. JMA is not entitled to prejudgment interest.

## FACTUAL CONTEXT FOR MOTION

I. THE INSURANCE CLAIM

In this action, JMA seeks coverage for a March 2013 dust incident under a first-party property policy (the "policy") issued to JMA by GC. Docket Entry ("DE") 1. Sand-blasting performed by a general contractor and subcontractor hired by the owner of the building in which JMA leased space (the "Property") caused lead-infused dust to enter JMA's work and storage space. *Id.* After JMA's early attempts to resolve the issue with the at-fault parties, JMA tendered the claim to GC, which immediately began analyzing the loss. Plaintiff Exhibit ("PX") 3.

From the onset of the claim process, GC and JMA were involved in numerous electronic, telephonic, and in-person communications regarding the claim. This extensive level of communication was necessitated in part by the nature of the work product that JMA stored at the Property. JMA stored approximately 64,000 pieces of its two- and three-dimensional work product at the Property. DE 1, ¶ 16. Addressing the impact of the dust on this work product was no ordinary task. As a result, the claim required the identification and retention of technical experts to address the damage. DE 80 at Ex. A, ¶ 27. Further, the involvement of the entities that caused the dust incident—the building owner, general contractor, and its subcontractors—as

2

well as their insurers (who required separate examinations of JMA's facility and retained their own experts) further complicated the process. Once lead was identified in the dust, the process was further complicated, as the previous bids to clean JMA's property were amended and/or withdrawn entirely. PX21. JMA decided to move from the Property, ultimately purchasing a building and then undertaking extensive repairs and a build-out of its new space. PX48 at B.

The policy provided three different potentially applicable coverages—business personal property, business income, and extra expense. DE 1-1 at 7-13. JMA purchased approximately $1.1 million in business personal property coverage (an amount, which by JMA's own admission, was significantly less than was necessary to cover the value of JMA's property). *Id.* at 3. The policy limits, however, did not apply to the business income or extra expense coverage. *Id.* at 12-13. As highlighted by GC in a number of communications sent to JMA, those provisions were subject to other applicable limitations. PX38. Notably, the policy only covered business income and extra expense (as defined by the policy) for the period of restoration, which was not to exceed one year from the date of loss. DE 1-1 at 12-13.

Within approximately five months of the loss, GC paid JMA the full $1.1 million limits of the policy's business property coverage, as well as $100,000.00 in additional property coverage under a separate endorsement. DE 1, ¶ 24. With respect to the business income coverage, after retaining an accounting expert and the advice of outside coverage counsel, GC paid JMA $536,177. DE 80 at Ex. A, ¶ 42. JMA, which had retained its own accounting expert, believed that GC owed it significantly more than that amount in business income coverage; by the time of trial, JMA was seeking nearly $2 million in business income coverage (which included both lost business income extending through August 2015—18 months beyond the one-

3

year policy limitation—and $1 million in losses associated with a fledgling retail operation that JMA was contemplating at the time of the incident). PX48 at A.

The policy's extra expense provision provided coverage for expenses incurred by the insured "to avoid or minimize the suspension of business and to continue operations . . . [a]t replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations." DE 1-1 at 13. On July 9, 2014, JMA submitted a proof of loss reflecting a total extra expense claim of $2,463,897.36. PX48 at B. On August 18, 2014, JMA submitted a revised proof of loss, amending its extra expense claim to $2,429,612.04.[1] PX52. Of that amount, approximately $1 million was for time spent by JMA's own officers and regular salaried employees to manage various aspects of the relocation of the business, calculated at the employees' professional rates. *Id.* In addition, JMA sought more than $1.4 million in costs associated with repairing, renovating, and furnishing the new building JMA purchased. *Id.*

Due to the complexity of the claim, GC retained Tom Hofbauer as coverage counsel to review JMA's extra expense claim. PX36. As he testified at trial, following his review of the claim file and the examination under oath of Jordan Mozer, Hofbauer advised GC that, in his opinion, JMA's relocation to the replacement premises was not necessary as a result of the dust incident and, thus, the claimed relocation expenses were not covered. Hofbauer further advised that the costs of tenant improvements and betterments, fixtures, and furnishings at the replacement premises were covered, if at all, as business personal property, not extra expense. Because GC had already paid out the limit of that coverage, such costs were not covered.

---

[1] In June 2016, JMA again revised its extra expense claim to $2,294,922.06, and in January 2017, as part of the joint pre-trial order, JMA asserted a total extra expense claim of $2,869,280.00. DE 80 at Ex. G. After the Court granted GC's motion *in limine* to exclude certain evidence, the total extra expense claim submitted to the jury at trial was approximately $2.1 million.

4

Moreover, Hofbauer disputed that the specific items claimed were necessary to equip and operate a suitable replacement premises and noted that many of the estimated costs had not yet been incurred, or were incurred after the one-year restoration period. After reviewing Hofbauer's advice, GC denied coverage on those grounds. PX35. In response, JMA argued that GC's representations that these types of costs would be covered resulted in a waiver of all policy limitations and required GC to pay the amounts JMA sought in full. DE 80 at 83-86.

## II.  THE COVERAGE LITIGATION

Ultimately, GC and JMA could not resolve these disputes, and JMA filed the instant action seeking additional business income and extra expense coverage. DE 1. After discovery, both parties moved for partial summary judgment on a number of issues. GC sought a ruling as a matter of law that JMA's extra expense claim was simply a claim for business personal property (which was subject to the limits that GC had already paid). DE 44-1. The Court noted that "this argument has some purchase." DE 61 at 8. The Court ultimately denied the motion because, as a matter of contract interpretation, the policy did not unequivocally preclude recovery of certain items as both covered property and extra expense. *Id.* at 9. GC also requested a ruling that JMA's claim for employee costs did not satisfy the policy's requirements for extra expense because they were not "incurred" by JMA. DE 44-1. The Court noted that this argument could be "compelling," but that GC lacked a sufficient factual predicate to warrant summary judgment. DE 61 at 5.

JMA also moved for summary judgment, seeking a ruling that its entire extra expense claim was covered because JMA satisfied the extra expense requirements of the policy and because any policy limitations should be erased by waiver and estoppel. DE 50-1. The Court, however, found that there were questions of fact regarding these issues. DE 61 at 10-12.

5

Importantly, the Court held that although there were some delays in processing JMA's claim, "given the extensive nature of Plaintiff's claims, the Court cannot say that GCC's actions were unreasonable or dilatory." *Id.* at 7.

The Court then convened a seven-day jury trial. JMA requested that the jury award it approximately $4.1 million in additional coverage, including: (1) extra expense of approximately $2.1 million; (2) business income from JMA's core architect and design business of approximately $1 million; and (2) business income from JMA's alleged loss of retail sales of approximately $1 million. The jury awarded JMA just over $ 1.1 million in extra expense, just under $300,000 in lost business income from JMA's core business, and nothing in lost business income from lost business sales. DE 136. Following the entry of a judgment in its favor, JMA filed the instant motion.

## ARGUMENT

### I. JMA HAS NOT DEMONSTRATED IT IS ENTITLED TO SECTION 155 RELIEF

#### A. The Insured Must Establish The Insurer Acted Vexatiously and Unreasonably To Obtain Section 155 Relief

Section 155 provides that "[i]n any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may" award Section 155 relief. 215 ILCS 5/155(1). To be entitled to relief, the insured must demonstrate that the insurer acted vexatiously and unreasonably based upon the totality of the circumstances. *Country Mut. Ins. Co. v. Hilltop View, LLC*, 24 N.E.3d 211, 222 (Ill. App. Ct. 2014) ("[The insureds] needed to litigate and prove [the insurer's] conduct was in fact vexatious and unreasonable if they wanted the court to impose attorney fees."); *Cook ex rel. Cook v. AAA Life Ins. Co.*, 13 N.E.3d 20, 37

6

(Ill. App. Ct. 2014) (court considers totality of circumstances in evaluating a Section 155 claim). "Because this statute is 'penal in nature' its provisions must be strictly construed." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). As stated by the Illinois Supreme Court, Section 155 relief is only available in the most egregious circumstances, when "the refusal to pay the claim is based upon the flimsiest sort of a pretext." *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 901 (Ill. 1996). Such "flimsy pretext" includes where the insurer destroyed the insured's policy upon notice of the claim (*see LaGrange Mem'l Hosp. v. St. Paul Ins. Co.*, 740 N.E.2d 21, 26 (Ill. App. Ct. 2000)), or where the insurer refused to pay a final, non-appealable arbitration award. *See Estate of Price v. Universal Cas. Co.*, 750 N.E.2d 739, 743 (Ill. App. Ct. 2001).

### B. A Bona Fide Coverage Dispute Precludes Section 155 Relief

Well-establish Illinois law demonstrates that where, as here, there is a bona fide coverage dispute, that fact alone precludes a Section 155 award. *See Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007) (finding "a bona fide dispute regarding coverage, and that is all Illinois law requires to avoid the imposition of [Section 155] penalties"); *O'Connor v. Country Mut. Ins. Co.*, 999 N.E.2d 705, 709 (Ill. App. Ct. 2013) ("The key question in an action under section 155 is whether the conduct of the insurance company was unreasonable and vexatious. [Citation omitted.] The relevant inquiry is whether the insurer had a *bona fide* defense to the insured's claim."); *W. Bend Mut. Ins. v. Norton*, 940 N.E.2d 1176, 1179-80 (Ill. App. Ct. 2010) ("The relevant inquiry to determine whether an insurer's actions were 'unreasonable and vexatious' is whether it had a *bona fide* defense to the claim."). "A *bona fide* dispute is one that is real, actual, genuine, and not feigned. Where an insurer reasonably relies upon evidence sufficient to form a *bona fide* dispute, that insurer has not acted unreasonably or vexatiously

7

under section 155." *Ill. Founders Ins. Co. v. Williams*, 31 N.E.3d 311, 317-18 (Ill. App. Ct. 2015) (internal quotation marks, citations, and alterations omitted). "Delay in settling a claim may not violate the statute if there is a *bona fide* dispute over coverage." *Certain Underwriters at Lloyd's, London v. Abbott Labs.*, 16 N.E.3d 747, 761 (Ill. App. Ct. 2014). So long as the insurer's coverage position has some basis in fact and/or is supported by the policy language and relevant case law, there can be no Section 155 liability. *Ill. Founders*, 31 N.E.3d at 319 (summary judgment for insurer on Section 155 claim appropriate where insurer had sufficient evidence to support its coverage position); *Cook ex rel. Cook*, 13 N.E.3d at 37 (coverage dispute rationally based in fact did not warrant Section 155 relief).

The bona fide dispute defense is applicable here. In handling this claim, once the magnitude of the loss became clear, GC paid the full limits of its business personal property coverage and paid significant amounts of lost business income. DE 80 at Ex. A, ¶¶ 30, 42. GC, however, had valid reasons to dispute whether JMA was entitled to additional coverage based upon the plain language of the policy. Any doubt about the genuine nature of the dispute is eliminated by examining the course of this case. At the summary judgment stage, the Court recognized that several of GC's arguments were potentially meritorious even though not warranting a summary judgment ruling. Even more telling, the Court denied JMA's motion for summary judgment because there were significant questions of material fact regarding each of the issues JMA raised. Since JMA is now relying upon these same disagreements about how the policy applies to support its Section 155 arguments (DE 141, ¶¶ 7, 11-14), the fact that a trial was necessary on the coverage issues demonstrates that the dispute was bona fide. *See Chi. Imp., Inc. v. Am. States Ins. Co.*, 2015 WL 2193138, at *6 (N.D. Ill. May 8, 2015) (insurer entitled to

summary judgment on bad faith claim because evidence showed a bona fide coverage dispute that required trial).

The jury also, in part, necessarily rejected the very same arguments that JMA is making now. At trial, JMA argued that GC's alleged representations that JMA's move would be covered and that it would be "flexible" resulted in either estoppel or waiver of the policy limitations. As a result, JMA argued that the jury should simply award JMA all of its $4.1 million in requested damages. The jury, however, awarded JMA only a portion of its claimed damages, rejecting the proposition that GC's conduct entitled JMA to everything it sought. DE 136. JMA now relies on this very same conduct to support the proposition that GC acted vexatiously and unreasonably. DE 141, ¶¶ 5, 6, 9-11, 16, 17. Since the Court has rejected this argument as a matter of law and the jury rejected it as a matter of fact, a vexatious and unreasonable finding based upon the same facts cannot stand. This is true even though JMA was ultimately awarded a portion of the additional coverage it sought. *See John T. Doyle Trust v. Country Mut. Ins. Co.*, 8 N.E.3d 490, 500 (Ill. App. Ct. 2014) (section 155 sanctions rejected even though the court ultimately rejected the insurer's coverage position); *Rosalind Franklin Univ. of Med. & Sci. v. Lexington Ins. Co.*, 8 N.E.3d 20, 46 (Ill. App. Ct. 2014) ("Moreover, section 155 fees and penalties are not awarded simply because the insurer refuses to settle or was unsuccessful in litigation.").

In short, given the record in this case that demonstrates that GC's position was anything but "flimsy pretext," there was a bona fide dispute that precludes Section 155 relief.

### C. Other Relevant Factors Do Not Support The Imposition of Sanctions

GC submits that the Court can end its consideration of JMA's Section 155 request by finding that a bona fide dispute precludes relief. If, however, the Court is inclined to consider

9

this question further, evaluation of other relevant factors demonstrates that JMA has not established that GC acted vexatiously and unreasonably. To justify Section 155 sanctions, JMA relies upon cherry-picked portions of the record, which it then mischaracterizes to support its theory. The Court will not be surprised to learn that GC disagrees with the vast majority of JMA's characterizations. GC does not, however, believe that it is necessary to go through each of these facts in detail to show that JMA has not met its burden of proof.[2] That is because, even giving JMA the benefit of all doubts, the facts relied upon by JMA do not support a finding that GC acted vexatiously and unreasonably when those facts are viewed in the context of the applicable case law (none of which JMA cites in its motion). A few examples demonstrate this point.

*First*, much of JMA's argument is predicated on the proposition that GC acted vexatiously and unreasonably because it applied the policy in a manner with which JMA disagreed. DE 141, ¶¶ 6, 11-14. Even if the Court sets aside the fact that these disputes between JMA and GC were bona fide, case law recognizes that an insurer's conduct is not vexatious and unreasonable if: "the insurer asserts a legitimate policy defense" and "the insurer takes a reasonable legal position on an unsettled issue of law." *See Citizens First Nat'l Bank*, 200 F.3d at 1110. Here, the policy's extra expense and business income coverages are time-limited. DE 1-1 at 12-13. It is undisputed that the majority of JMA's claimed extra expenses and lost business income occurred after the 12-consecutive-months period. PX48. The time limitation is an unambiguous contractual provision that GC reasonably sought to enforce. JMA's belief that

---

[2] GC is compelled to comment on one of JMA's particularly egregious mischaracterizations. JMA argues that GC acted vexatiously and unreasonably by, for example, "telling Mozer repeatedly that its relocation and moving costs were covered under the Policy, and then, after Mozer moved, reversing its position and refusing to pay one cent of the relocation expenses or costs to equip and operate the replacement premises." DE 141, ¶ 6. JMA knows full well, however, that at summary judgment the Court found that any such representations were not nearly as unequivocal as JMA now argues, (DE 61 at 10-12), and the evidence at trial mirrored what was presented to the Court at summary judgment.

10

those provisions should not be enforced because of waiver and estoppel does not negate that GC's position was firmly rooted in the policy language, defeating JMA's Section 155 claim.

Moreover, this claim presented unique issues regarding the application of extra expense coverage. JMA has acknowledged that it was significantly underinsured for its business property, given the value of its 64,000 pieces of work. DE 1, ¶ 21. In its motion for partial summary judgment, GC noted that the intersection of business personal property and extra expense coverage had not been squarely addressed by Illinois courts. DE 44-1 at 6. In response, JMA did not cite any Illinois case squarely on point. DE 50-1 at 10-11. Given the lack of clarity under Illinois law, GC's position on this unsettled point was not vexatious and unreasonable, a point made clear by the Court's summary judgment finding that there was some merit to GC's position. DE 61 at 8 (noting that GC's argument "has some purchase, but is ultimately unavailing").

*Second*, JMA criticizes GC for delaying the resolution of the claim and its ultimate move to a new facility. DE 141, ¶¶ 5, 9, 10, 16, 17. Even assuming that GC was responsible for all of these delays (the evidence at trial demonstrated that the delays were caused primarily by the complexity of the art restoration process and the involvement of third parties like the tortfeasors over whom GC had no control), Illinois courts recognize that Section 155 sanctions are not warranted when there are complicated factual issues regarding how the coverage applies. *See Citizens First Nat'l Bank*, 200 F.3d at 1110. This principle squarely applies here to this complicated art restoration claim that had multiple moving parts. Indeed, this Court has already found that, although the claim was complicated and there were delays in the process as a result, "the Court cannot say that GCC's actions were unreasonable or dilatory." DE 61 at 7. This finding alone defeats JMA's argument.

11

*Third*, JMA asserts that GC failed to appropriately investigate the claim. DE 141, ¶¶ 15, 16. JMA offers no evidence or case law to support this argument, likely because it is implausible on its face. While JMA may have disagreed with how GC's investigation played out, the fact that GC dedicated extensive resources to adjust this claim cannot be seriously disputed. Those resources involved significant efforts by GC's claims handlers as well as the retention of an outside accounting expert and outside counsel on whose advice GC relied. PX36; DE 80 at Ex. A, ¶ 32. When the diligent investigation is layered upon the extensive communications between GC and JMA, it is clear that these circumstances do not give rise to a Section 155 claim. *See WAM FAM5, Inc. v. Nova Cas. Ins. Co.*, 2017 WL 1075069, at *10 (C.D. Ill. Mar. 21, 2017) (insurer investigated claim sufficient to preclude imposition of Section 155 claim and there were factual issues about how the coverage applied); *O'Connor*, 999 N.E.2d at 709 (insurer was "fully engaged" in investigating claim and presenting its defense to coverage).

*Fourth*, JMA claims it is entitled to Section 155 relief because it was forced to sue GC to obtain coverage. DE 141, ¶ 15. While an insured filing suit to obtain coverage is a factor that can support Section 155 relief, JMA conveniently ignores that GC paid it approximately $1.7 million in policy benefits (including paying out the limits of the business personal property coverage) without a lawsuit. The fact that GC paid these significant sums—even while disputing JMA's right to other coverage, which eventually led to litigation over the disputed amounts—defeats, rather than supports, JMA's entitlement to Section 155 relief.[3]

---

[3] JMA also argues that its insurance adjusting expert, Edward McKinnon, testified that GC's claim handling fell below the standard customs and practices in the industry and supports the vexatious and unreasonable nature of GC's conduct. DE 141, ¶ 5. McKinnon, however, was not tendered as an expert on the Section 155 claim and JMA has not made the necessary showing to rely on expert testimony at this juncture. In any event, McKinnon testified that he did not evaluate GC's claim handling in light of Section 155's "vexatious and unreasonable" standard. McKinnon's testimony, therefore, is of no value to the Court as it determines whether GC's conduct violated Section 155, especially in light of the entire record of this case.

These examples—as well as the other arguments made herein—demonstrate what has been clear from the onset. JMA has fallen woefully short of demonstrating that this case is within the range of narrow circumstances under which Illinois courts find Section 155 sanctions appropriate. The Court should deny JMA's motion as a result.

**II.     JMA IS NOT ENTITLED TO PREJUDGMENT INTEREST BECAUSE THE AMOUNT DUE WAS NOT LIQUIDATED**

An award of prejudgment interest in contract actions is controlled by Section 2 of the Illinois Interest Act, 815 ILCS 205/2. The statute allows prejudgment interest only where the sum owed under the contract is liquidated or subject to easy determination. *See Santa's Best Craft, L.L.C. v. Zurich Am. Ins. Co.*, 941 N.E.2d 291, 307 (Ill. App. Ct. 2010). Illinois courts hold that prejudgment interest is not appropriate where, as here, the insured was unable to state with any certainty the amount of the loss allocable to the insurer's policy. For example, in *Santa's Best*, the appellate court refused to disturb the trial court's determination that prejudgment interest was not warranted because the amount of defense costs subject to coverage was only determined after a three-day hearing that resulted in an award of approximately 14% of the amount sought by the insured. *Id.* at 308. As a result, the appellate court held the damages were not "easily determined or liquidated." *Id.* In *Federal Insurance Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 60 (Ill. App. Ct. 2009), the appellate court affirmed the denial of prejudgment interest where the insurer had disputed coverage of a class action settlement in good faith, notwithstanding the trial court's determination that the insurer was liable for the amount incurred by the insured in settling the underlying case. Likewise, in *A. Kush & Associates., Ltd. v. American States Insurance Co.*, 927 F.2d 929, 936-37 (7th Cir. 1991), the Seventh Circuit Court of Appeals affirmed denial of prejudgment interest when the jury's award of

approximately half of what the insured demanded in defense costs indicated that the amount due under the policy was in dispute.

In *Couch v. State Farm Insurance Co.*, 666 N.E.2d 24, 27 (Ill. App. Ct. 1996), the court affirmed the trial judge's denial of prejudgment interest on a first-party property claim that resulted in a jury verdict for the insured. The appellate court agreed that the significant difference between the amount the insured sought and the jury's award "serve[d] as a strong indication that the amount of damages was not readily ascertainable." *Id.* at 28. *See also Abbott Labs.*, 16 N.E.3d at 762 (four days of trial testimony regarding damages revealed that amount was not liquidated and interest was not warranted as a result).

Here, JMA's multiple submissions on its alleged damages show that its claim was not liquidated or readily ascertainable. JMA's purported damages dramatically fluctuated with each new proof of loss it submitted to GC; then, its alleged damages peaked in the final pre-trial order before receding to the approximately $4.1 million it requested from the jury. PX48, 52; DE 80 at Ex. G. Moreover, after a seven-day jury trial focused primarily on damages issues, JMA sought $4,148,630 and the jury only awarded JMA $1,390,716.64. This disparity further evidences that the amount of damages was not subject to an easy determination. Given these uncertainties, and JMA's complete failure to meaningfully address the requirements for prejudgment interest, the Court should deny JMA's request for prejudgment interest.

## CONCLUSION

For the reasons set forth herein, GC requests that the Court deny JMA's request for relief under Section 155 and for prejudgment interest.

Dated: November 30, 2017

Respectfully submitted,

LEAHY, EISENBERG & FRAENKEL

By: /s/ *Scott Wing*
      One of Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| **Bradley Paul Nelson**<br>Schopf & Weiss LLP<br>One South Wacker Dr., 28th FL<br>Chicago, IL 60606<br>(312) 701-9300<br>(312) 701-9335<br>nelson@sw.com | **Howard B. Randell**<br>Leahy, Eisenberg & Fraenkel<br>33 West Monroe Street<br>Chicago, IL 60603<br>(312) 368-4554<br>(312) 368-4562<br>hbr@lefltd.com |
| **Nicholas A. Gowen**<br>Schopf & Weiss LLP<br>One South Wacker Drive<br>Chicago, IL 60606<br>(312) 701-9300<br>(312) 701-9335<br>gowen@sw.com | **Thomas J. Finn**<br>Leahy, Eisenberg & Fraenkel, Ltd.<br>33 West Monroe Street<br>Chicago, IL 60603<br>(312)368-4554<br>(312) 368-4562<br>tjf@lefltd.com |
| **Scott Wing**<br>Leahy, Eisenberg & Fraenkel<br>33 West Monroe Street<br>Suite 1100<br>Chicago, IL 60603<br>(312) 368-4554<br>(312) 368-4562<br>sw@lefltd.com | |

Scott Wing
LEAHY, EISENBERG & FRAENKEL, LTD.
33 W. Monroe Street, Suite 1100
Chicago, Illinois 60603-5317
Email: sw@lefltd.com
Tel. (312) 368-4554
ARDC #: 6298780
\\lefpl\Prolaw Files\Documents\QBE\16454\PLEADINGS\455739.DOCX